# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 7, 2023

Lyle W. Cayce
Clerk

_____

No. 22-10766

_____

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

TIMOTHY RAY VASQUEZ,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 6:20-CR-1-1

_____

Before WIENER, WILLETT, and DOUGLAS, *Circuit Judges*.
PER CURIAM:[*]

Defendant–Appellant Timothy Ray Vasquez, former Police Chief for the City of San Angelo, Texas, accepted money from a city vendor in exchange for Vasquez's support of the vendor's future contracts with the city. A jury convicted Vasquez of bribery and honest-services mail fraud. On appeal, Vasquez challenges the district court's jury instructions and the sufficiency of the government's evidence against him. We AFFIRM.

_____

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 22-10766

I.

In 2007, Vasquez was the elected Police Chief of San Angelo. He was part of a twelve-member committee tasked with overseeing a competitive bidding process for a new radio system for the city's public safety agencies. The committee awarded the contract, worth approximately $6 million, to Dailey & Wells Communications, Inc. ("D&W").

Vasquez was not merely a police officer: He also had a side gig in rock and roll. His band, Funky Munky, played at events and weddings across the San Antonio area. In April 2007—after the committee had recommended D&W for the radio contract but before the contract had been officially awarded—D&W began hiring Funky Munky to play at corporate events. D&W would pay Funky Munky at least three times more than the band usually charged. Between 2007 and 2014, D&W paid Vasquez a total of $84,000 for ten performances. As leader of the band, Vasquez deposited D&W's payments into his personal bank account. D&W also gifted Vasquez tickets to various professional sporting events.

In 2014, after two successful reelection campaigns by Vasquez, it was again time for the city to update its radio systems. Although the city usually used a competitive bidding model to award such contracts (as it had in 2007), Vasquez invoked a "public safety exception" to avoid the lengthy process for requesting proposals. At a June 2015 City Council meeting, Vasquez advocated for D&W to receive the new contract. Although some councilmembers had concerns about D&W, they ultimately voted to approve the contract, again worth almost $6 million. Several councilmembers noted that Vasquez's support of D&W was crucial to their decision to vote in favor of the contract. Many of the councilmembers who testified at Vasquez's trial stated that, had they known about his financial relationship with D&W, they would have voted differently.

No. 22-10766

From 2016 to 2019, Vasquez received another $86,000 from D&W. That total included a $50,000 lump sum given in December 2016, considered a "retainer" for ten future performances, which were played over the next three years. That payment was made soon after Vasquez discovered that he was being investigated by law enforcement.

Vasquez was indicted in January 2020, charged with one count of federal-programs bribery, in violation of 18 U.S.C. § 666(a)(1)(B), and three counts of honest-services mail fraud, in violation of 18 U.S.C. §§ 1341 and 1346. At trial, Vasquez testified that he made a mistake by failing to disclose his relationship with D&W to the City Council, but that he saw his band's performances and his work on the radio contracts as "two totally different things." The jury found Vasquez guilty of all charges, and he was sentenced to 186 months of imprisonment. On appeal, Vasquez contends that the district court gave an incorrect instruction on the honest-services fraud count and challenges the sufficiency of the evidence to convict him of bribery.

II.

Section 1346 of Title 18 of the U.S. Code proscribes using mail or wire fraud to "deprive another of the intangible right of honest services." This statute was intended to reach fraud that did not result in the traditional symmetry between benefit to the perpetrator and harm to the victim. *Skilling v. United States*, 561 U.S. 358, 400 (2010) ("*Skilling I*"). For example, if a city official accepts a bribe from a third party in exchange for awarding a contract to that party, that official defrauds the public, even if the contract resulted in savings for the city. *See id.* The acceptance of the bribe deprives the public of its right to the official's honest services. *See id.*

The Supreme Court has construed § 1346 to encompass only bribery and kickback schemes. *Id.* at 408–09. Thus, in proving honest-services fraud, the government must also prove that the defendant engaged in either bribery

No. 22-10766

or kickbacks, as defined by those federal statutes. *Id.* at 412–13 (citing 18 U.S.C. §§ 201(b) (bribery of public officials), 666(a)(2) (bribery concerning federal programs); 41 U.S.C. § 52(2) (definition of kickback)[1]); *see also United States v. Nagin*, 810 F.3d 348, 351 (5th Cir. 2016).

At Vasquez's trial, the district court gave the government's requested jury instruction on honest-services mail fraud based on bribery or kickbacks, which was taken from the Department of Justice's Criminal Appellate Division's suggested charge:

> Bribery and kickbacks involve the exchange of a thing or things of value for official action by a public official, in other words, a *quid pro quo* (a Latin phrase meaning "this for that" or "these for those"). Bribery and kickbacks also include offers and solicitations of things of value for official action . . . . [A]ll that must be shown is that payments were made with the intent of securing a specific type of official action in return. Payments may be made with the intent to retain the official's services on an as needed basis so that whenever the opportunity presents itself, the public official will take specific official actions on the giver's behalf.

The court further instructed that a kickback is "any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind." That definition comes from the statute, 41 U.S.C. § 52(2), which has also been incorporated into this court's pattern instructions. *See* Fifth Circuit Pattern Jury Instructions (Criminal) § 2.56 (2019).

---

[1] The definition of a kickback is now codified at 41 U.S.C. § 8701(2) (2011). Because the cases that the parties cite predate the statutory amendment, we continue to refer to 41 U.S.C. § 52(2) as the source of the kickback definition.

On appeal, Vasquez challenges two components of the instruction: (1) the inclusion of the word "gratuity" in the definition of kickback, and (2) the "whenever the opportunity presents itself" language.

## A.

First, the parties dispute the appropriate standard of review for a challenge to jury instructions. Vasquez asserts that the court should apply a harmless error standard, given the district court's "alternative-theory error," which allowed the jury to convict him on an improper theory of guilt. The government counters that plain error analysis is appropriate because Vasquez failed to object properly to the instruction at the charge conference. Because Vasquez's arguments fail even the less stringent standard of harmless error, we decline to engage in the issues of waiver and forfeiture raised by the government.

An alternative-theory error occurs when "a jury rendering a general verdict was instructed on alternative theories of guilt and may have relied on an invalid theory." *United States v. Skilling*, 638 F.3d 480, 481 (5th Cir. 2011) ("*Skilling II*"). Vasquez alleges that the district court wrongfully instructed the jury that it could convict on either a bribery or a gratuity theory of honest-services fraud. He claims the gratuity basis is an "invalid theory" of guilt of this crime, making the district court's instruction an alternative-theory error. Under the harmless error standard, we will affirm the jury's findings if we "conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error," or "if the jury, in convicting on an invalid theory of guilt, necessarily found facts establishing guilt on a valid theory." *Id.* (first quoting *Neder v. United States*, 527 U.S. 1, 19 (1999), then citing *United States v. Howard*, 517 F.3d 731, 738 (5th Cir. 2008)).

No. 22-10766

B.

Bribery requires that an impermissible gift be given with the intent to influence an official act, whereas a gratuity is given "for or because of" an official act. *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404 (1999). While bribery thus requires a *quid pro quo*, a gratuity may be a "reward for some future act that the public official will take . . . or for a past act that he has already taken." *Id.* at 405. Vasquez contends that the district court's instruction allowed the jury to convict him of honest-services fraud under an impermissible definition of bribery and kickback, which allowed for a gratuity (as opposed to a *quid pro quo*) theory of fraud.

The instruction did no such thing. Section 1346 itself does not require a *quid pro quo* such that a gratuity can never satisfy its "predicate" offense. Federal-programs bribery under 18 U.S.C. § 666(a)(2) and bribery of public officials under § 201(b) both require a *quid pro quo*, but the kickback statute, 41 U.S.C. § 52(2), does not. *See Sun-Diamond*, 526 U.S. at 405–06; *United States v. Hamilton*, 46 F.4th 389, 398 (5th Cir. 2022). And the only mention of the word "gratuity" by the district court came in its instructions' definition of "kickback," which came directly from the federal statute. *See Whitfield v. United States*, 590 F.3d 325, 354 (5th Cir. 2009) ("It is well-settled that a district court does not err by giving a charge that tracks this Circuit's pattern jury instructions and that is a correct statement of the law."). Since honest-services fraud may be based on either bribery *or* kickbacks, and since we have been tasked with assessing honest services through the lens of federal statutes "proscribing" and "defining" those crimes, this instruction was not given in error. *Skilling I*, 561 U.S. at 412–13.

Furthermore, even if the instruction had been flawed in some way, the error would have been harmless because the district court did in fact require the jury to find Vasquez guilty of bribery before convicting him of honest-

6

services fraud. As the Supreme Court has made clear, the only difference between a bribe and a gratuity is that the latter does not require a *quid pro quo*. *Sun-Diamond*, 526 U.S. at 404–05. The district court here instructed multiple times that the jury needed to find a *quid pro quo*, or an "exchange of a thing or things of value for an official action." The "essential idea of give-and-take" was clearly conveyed. *Whitfield*, 590 F.3d at 351 (citation omitted). This ensured that Vasquez's conviction for honest-services fraud was based on a valid theory of bribery. Because the jury "necessarily found facts establishing guilt on a valid theory," Vasquez cannot demonstrate that any error that the district court allegedly made in mentioning the word "gratuity" was more than harmless. *See Skilling II*, 638 F.3d at 481–82.

## C.

Vasquez next complains that the district court's instruction allowed the jury to convict him under § 1346 based on an improper "as opportunities arise" theory of bribery. He asserts that bribery requires the payor to intend to influence a specific official act, rather than merely to build up a "reservoir of good will" for when and if an opportunity might potentially arise in the future. This argument is in many ways related to his complaint about the district court's use of the word "gratuity," as a gratuity could be "a reward for some future act that the public official will take." *Sun-Diamond*, 526 U.S. at 405. As discussed above, though, the jury clearly concluded that Vasquez had accepted a bribe rather than a gratuity, because it necessarily found a *quid pro quo*. Vasquez's allegations here center instead on the relationship between the *quid* and the *quo*.

The federal bribery statute defines an "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place

of trust or profit." 18 U.S.C. § 201(a)(3). Here, the parties do not meaningfully dispute whether Vasquez's actions in advocating for D&W's receipt of the contract before the City Council were "official." Nor can they, because an official act involves "a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or *a hearing before a committee.*" *McDonnell v. United States*, 579 U.S. 550, 574 (2016) (emphasis added). The parties do, however, disagree on whether Vasquez needed to know, at the time that D&W hired Funky Munky, that it did so with the expectation that Vasquez would do what he did and testify before the Council in support of D&W's receipt of the contract. Vasquez contends that the district court's instructions erroneously permitted the jury to convict him of honest-services fraud for accepting D&W's payments in exchange for an agreement to take some unknown action beneficial to D&W at some unknown time in the future.

In *McDonnell v. United States*, the Supreme Court considered the relationship between *quid* and *quo* when it assessed the validity of the former governor of Virginia's conviction for honest-services fraud. *Id.* at 555. There, a pharmaceutical executive had given almost $200,000 in gifts to the governor and his wife in the hopes that the governor would assist him in getting funding for specified medical studies. *Id.* The governor arranged meetings for the executive, hosted events for the pharmaceutical company, and contacted other government officials about the studies. *Id.* at 555–56. The central issue in the case was whether such actions constituted "official acts" within the meaning of honest-services fraud, defined "with reference to the federal bribery statute, 18 U.S.C. § 201." *Id.* at 562. The Court further considered whether honest-services fraud requires that, at the time that the gifts were accepted, the governor knew that they were given with the expectation that he would perform a specific official act in return. *Id.* at 572–73.

The Court held that, to be found guilty of bribery, a public official must have agreed to act on a particular "question, matter, cause, suit, proceeding or controversy." *Id.* at 572. It did not, however, require that the agreement "specify the *means* that [the official] will use to perform his end of the bargain." *Id.* (emphasis added). All that is needed is that the official knew that he was accepting the thing of value in exchange for some action on a "specific and focused" question or matter. *Id.* at 574; *see also United States v. Silver*, 948 F.3d 538, 553 (2d Cir. 2020) ("[B]ribery [does not] require [] a promise to perform a particular official act."). As we have explained, while "the generalized hope or expectation of ultimate benefit on the part of the donor does not constitute a bribe . . . the government need not show that the defendant intended for his payments to be tied to specific official acts." *Whitfield*, 590 F.3d at 350 (quoting *United States v. Jennings*, 160 F.3d 1006, 1013–14 (4th Cir. 1998)).

Here, the question or matter that Vasquez was agreeing to act on when he accepted payment from D&W was the company's business relationship with the city. That relationship was the genesis of Vasquez's own association with D&W, which hired Funky Munky after Vasquez was elected. He need not have agreed at that time to testify before the City Council in support of D&W's modification contract in 2015, but simply to support D&W's continued economic relationship with the city whenever an opportunity to do so should arise in the future. That agreement was for more than a general "reservoir of goodwill," but was instead for future support of D&W's financial relationship with the city. The district court's instructions appropriately required the jury to find this before returning a guilty verdict on the counts for honest-services fraud.

Our holding today comports with *Whitfield*, in which we upheld the conviction of a judge for bribery when the judge, at the time he accepted the payment, did not know in which cases the payor would appear before him and

require a favorable ruling. *Id.* at 353.[2] It was enough that the jury found a "specific intent to give or receive something of value *in exchange* for an official act" to be performed sometime in the future. *Id.* (quoting *Sun-Diamond*, 526 U.S. at 404–05); *see also United States v. Hamilton*, 46 F.4th at 339–40 (distinguishing *Whitfield*, in which "there was no debate about whether the payor got something in return; the only debate was about whether, when the payment was made, the payor and local official had in mind what the *quo* would be"). It would have been impossible for the judge to know at the time of payment which future cases would be relevant to the agreement, just as it was unlikely that Vasquez knew when and how the opportunity would arise to support D&W's business relationship with the city. The district court's instructions clearly required the jury to find a *quid pro quo*, in which Vasquez accepted D&W's payments in exchange for his support, whenever in the future the need for it might arise. Nothing more was needed.

## III.

Vasquez halfheartedly raises two other issues. First, he claims that his conviction for federal programs-bribery is "tainted by the prejudicial spillover" from the honest-services fraud count. Because there was no error in the district court's instructions on the honest services count, there can be no "prejudicial spillover."

Vasquez also challenges the sufficiency of the evidence of a *quid pro quo* to sustain his convictions. He failed to renew his motion for judgment of acquittal at the close of all evidence, so this court reviews his contention

---

[2] *Whitfield* pre-dates the Supreme Court's decision in *McDonnell*. Although we have not specifically addressed whether the "retainer theory" survives *McDonnell*, other circuits have addressed it and have concluded that it does. *See, e.g.*, *United States v. Silver*, 948 F.3d 538, 552-55 (2d Cir. 2020); *United States v. Roberson*, 998 F.3d 1237, 1251 (11th Cir. 2021). In any case, the instructions given here meet the requirements of *McDonnell*.

under the plain error standard. *United States v. Cabello*, 33 F.4th 281, 285 (5th Cir. 2022). We will only reverse on plain error if there has been a "miscarriage of justice" and "the record is *devoid of evidence* pointing to guilt or if the evidence is so tenuous that a conviction is shocking." *Id.* at 330–31 (citation omitted). Vasquez must therefore "demonstrate not just that the government's evidence of [bribery] was insufficient, but that it was *obviously* insufficient." *Id.* at 331.

He is unable to do so. The government presented evidence that D&W hired Funky Munky after Vasquez was elected Police Chief, and that it paid the band more than three times what it usually received. Later, when the opportunity arose, Vasquez supported D&W's continued business relationship with the city, even going so far as to convince the City Council to abandon its traditional process of requesting proposals. The jury reasonably found a relationship between the payments and Vasquez's actions.[3]

As the government notes, Vasquez's sufficiency argument is mainly a reiteration of his earlier contention that an agreement to support the payor "as opportunities arise" may not be a "*quo*." As discussed above, that is an inaccurate statement of the law. The government presented evidence of a *quid pro quo* agreement between D&W and Vasquez: almost $180,000, disguised as fees for band performances, in exchange for support on future city contracts. And, as the district court instructed, that is a valid theory of bribery.

We find no error in Vasquez's conviction. AFFIRMED.

_____

[3] Another strong piece of evidence of *quid pro quo*: the $50,000 lump sum paid to Vasquez by D&W right after he learned he was being investigated. The government characterized this payment as "hush money."